## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| Melissa Wanna on behalf of herself individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | **CLASS ACTION COMPLAINT** **(JURY TRIAL DEMANDED)** |
| v. | ) ) | |
| RELX Group plc, Reed Elsevier Inc. d/b/a LexisNexis,  RELX Inc. d/b/a LexisNexis, LexisNexis Risk Solutions Inc., LexisNexis Risk Solutions FL Inc., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff, by and through her attorneys, for her Complaint against Defendants and on behalf of all others similarly situated, upon personal knowledge as to her own facts and conduct and based upon information and belief as to all other matters, states and alleges as follows:

## I.    INTRODUCTION

1. The following case deals with Defendants' illegal sale of consumer data through a series of intermediaries; one example of a Lexis intermediary is MyLife.com, Inc. (hereinafter, "MyLife"), a company that is currently the subject of thousands of consumer complaints and lawsuits and a United States Department of Justice

Enforcement Action. This morass of litigation led MyLife to file bankruptcy in the fall of 2022.

2. Plaintiff Melissa Wanna's consumer data was sold by Lexis through its agent MyLife -- leading to substantial damages, including the release of her protected address to an abusive ex-spouse.

### A. Nature of the Case and Defendants' Unlawful Business Practices

3. Ms. Wanna's experience with Defendants is typical of the putative Classes she seeks to represent. As is true of many putative class members, Ms. Wanna searched for herself online while interviewing for new jobs. Like all individuals in similar circumstances, Ms. Wanna's success in finding employment was highly reliant on maintaining a good name and reputation. Therefore, understandably, her reputation and online persona were of great importance to her. Ms. Wanna's concern was well placed. Prospective employers' first impression of Ms.Wanna was often established through use of a quick Internet search. That is, it was common during Ms. Wanna's job search for potential employers to perform a quick Internet search using terms similar to "Melissa Wanna" and "Melissa Wanna Minnesota".

4. Searching "Melissa Wanna" on an Internet search engine (accessed through an anonymous browser window) as recently as December 3, 2022 produced numerous listings for Melissa Wanna.

5. Upon clicking on the first available link, users are brought to a page created by MyLife that states, "Melissa Wanna, 37 – Sartell, MN … Reputation Score 1.85 – 3.79. ALERT: Court Records Found." <u>NOTE:</u> the warning "ALERT: Court Records

Found" appears in *red ink* – thus communicating a particular danger regarding Ms. Wanna.

6. Based on records obtained though MyLife, MyLife purports to calculate Ms. Wanna's "reputation" score as 1.85 -- 3.79.

7. MyLife bases its assessment on public records, other private financial and driving records all obtained from Defendants.[1]

8. According to MyLife, a reputation score of 1.85 would equate to a "poor" general reputation.

9. Upon attempting to view Ms. Wanna's records controlled by Defendant MyLife, it is stated that Ms. Wanna's profile "might include sensitive details gathered from Civil & Criminal Court records, & sexual offender list."

10. Furthermore, this notice appears: "ATTENTION! Melissa Wanna's Profile May Contain Surprising Info – Profile may contain sensitive information & graphic content. We do not censor information." To learn more about Ms. Wanna, the user must then "agree" to the following statement: "I understand I may see Graphic comments on Melissa Wanna's report."

11. For a fee, page viewers are then offered additional information about Ms. Wanna and any other individual unfortunate enough to have an unlawful report provided by Defendants and sold by MyLife.

---

[1] MyLife is excluded as a defendant in this matter solely on the basis of its September 9, 2022 bankruptcy filing in the U.S. Bankruptcy Court for the Central District of California (Los Angeles Division).

12. In fact, MyLife boldly claims in its advertising that it can produce a report on nearly every adult American.

13. On information and belief, these MyLife background reports are principally nothing more than Defendants' reports reformatted with minor input from other sources.

14. Importantly, based upon information and belief, as well as direct evidence, MyLife obtains its information from defendants LexisNexis Risk Solutions Inc., LexisNexis Risk Solutions FL Inc., RELX Inc. d/b/a LexisNexis, Reed Elsevier Inc. d/b/a LexisNexis, and RELX Group plc, also operating under the name LexisNexis (hereinafter, collectively referred to as "Lexis" or the "Lexis Defendants").

15. MyLife is believed to obtain its data though a LexisNexis product called LexisNexis® Public Records, which all defendants contribute to and operate through software as part of a common enterprise.

16. Until Plaintiff is allowed to do further discovery, the exact contribution of each Lexis defendant contributor is unclear, as Lexis has failed to update corporate records and continues in certain cases to use obsolete corporate names on official documents, intentionally obfuscating such records, thereby engaging in deceptive trade and business practices.

17. Furthermore, on information and belief, Defendants do not only sell confidential information about consumers to MyLife and other purchaser/resellers, including to a variety of "people search" services many of which have no protections to assure that users have a permissible purpose to access the data: (An exhaustive list of these services will not be known until discovery can be undertaken.)

18. Continuing with this MyLife example, MyLife claims to be in the business of tracking data on "reputations" and selling the information to third parties for the purpose of "keeping yourself safe" from, *inter alia*, "home service providers" and to avoid becoming "victims of fraud or worse."

19. However, in addition to ostensibly selling its data to persons with legitimate business purposes, MyLife sells the data it obtains directly from the Lexis Defendants, including confidential data required by law to be protected, to *any person* willing to pay for a report.

20. MyLife goes so far as to allow the purchase of reports even if the purchaser refuses to state the information will not be used to STALK or harass individuals.

21. Based upon information and belief, the Lexis Defendants and their officers, directors and managers are fully aware of MyLife's willingness to sell data to persons without a legitimate business purpose, including data that the Lexis Defendants previously promised to protect in agreements with various state and local governmental providers.

22. Specifically, for example, in order to obtain records from the Minnesota Department of Public Safety's Driver and Vehicle Services Division, Lexis signed a "Records Access Agreement" which stated, "The DVS data will not be used for personal or non-business purposes. To wit, any such use is in violation of state and federal law."

23. Moreover, in an agreement signed pursuant to Rules of Public Access to Records of the Judicial Branch Rule 8 Subdivision 3, ¶(b), Lexis falsely certified to the State Court Administrator that it performs certain additional verifications prior to

delivering court records to its users – when, in fact, Lexis does nothing whatsoever to further verify such records.

24. Despite signing these agreements with Minnesota officials and despite signing other similar record access documents across the nation with various state, local, and, in some cases, federal officials, Lexis immediately and knowingly transmitted data to its various entities and subsidiaries and then further transmitted such on to MyLife and other similar companies.[2]

25. At the time Lexis transmitted the data to MyLife, Lexis was fully aware and knew MyLife intended to supply the data to persons without any legitimate business purpose. Such knowledge of and conduct by defendants inevitably arises to *scienter* on behalf of defendants.

26. As a disturbing but cogent example of the Defendants' blatant misuse of protected driver data, MyLife even touts the usefulness of its reports in dating.[3]

27. In fact, the Lexis Defendants and their officers, directors and managers knew that MyLife even went so far as to coerce certain users of the data disclaim a legitimate purpose in an attempt to avoid regulation under other state and federal laws, thereby acting in defiance of such laws.

---

[2] Plaintiff Wanna already has in her possession and will submit incontrovertible evidence of such conduct by Defendants.
[3] The Drivers Privacy Protection Act (hereinafter "DPPA") was passed after an obsessed fan fatally shot actress Rebecca Schaeffer in the doorway of her West Hollywood home in 1989. Obsessed with dating Ms. Schaeffer, the man had stalked Ms. Schaeffer for months. He ultimately obtained her home address from the California Department of Motor Vehicles. The anti-stalking protections at the heart of the DPPA are precisely the protections Defendants violated in this matter.

28. As Lexis is well aware, MyLife is, however, purposefully indiscriminate in its sales, selling to both persons with no legitimate business need and ostensibly marketing to others with a legitimate business purpose.

29. For example, MyLife alleges on its website that the reputation score it calculates is "more important than a credit score" and that a poor reputation, as indicated by the score    calculated by the company, is useful in, *inter alia*, "filtering job applicants, service providers, business opportunities, and dating prospects."

30. As a way to deceptively draw in unwitting individuals, MyLife widely advertises that a poor reputation score could cost someone a job and affect personal relationships; for example, in one advertisement MyLife states, "Did you ever send out your resume and never hear back?" and "A bad reputation can hurt you personally and professionally."

31. MyLife's unlawful conduct is not just limited to failing to secure data and assuring its proper use: MyLife, with the direct and substantial cooperation and assistance of Lexis, also runs a cyber extortion scheme whereby MyLife offers to allow users to remove inaccurate, confidential information, together with the false and otherwise negative narrative information the company authors and posts as a quid pro quo *in exchange for a fee* paid directly to MyLife.

32. MyLife runs this scheme under the guise of "Reputation Repair" by asking individuals to "claim" their page with information allegedly collected by third party sources. In fact, the company itself is the true publisher of most of the negative information, having falsely (and illegally) interpreted third party records, failed to

verify records as promised, falsely attributed records to the wrong users, added additional fabricated information, and in nearly all cases, heavily editorialized otherwise accurate information.

33. In fact, MyLife makes no effort to correct the data with any third party, instead it merely removes such data from its own website.

34. MyLife then asks users to enroll in a monthly plan costing between $13.95 and $16.95 per month (minimum commitments required).

35. Defendant Lexis has absolute knowledge of MyLife's illegal practices and directly profits and benefits from Mylife's illegal practices by retaining a share of MyLife's monetary proceeds obtained from its (MyLife's) illegal conduct.

36. The United States Department of Justice successfully litigated a suit against MyLife and its founder and CEO, Mr. Jeffrey Tinsley, alleging, *inter alia*, that the company thereafter prevented subscribers from canceling MyLife's fraudulent services, in violation of a host of federal laws. (See United States of America v. Mylife.com, Inc. and Jeffery Tinsley, Case. No. Case 2:20-cv-06692 (U.S. District Court, Central District of California, Western Division).

37. Astonishingly, and in defiance of law, Lexis continued to provide to MyLife with the personal data of millions of Americans.

38. This "protection racket" is, by any measure, the digital reputation equivalent of selling "fire protection" to the local shopkeeper – the promise that "so long as the shop continues to pay the premium, the store does not burn down".

39. Lexis willfully participates in this scheme for a share of fees.

40. The MyLife scheme operates by posting only a portion of the information it collects about individuals to so-called individual teaser pages ("Teaser Pages") linked to the individual's name. These Teaser Pages are then used to optimize exposure during individual name queries using search engines.

41. Such behavior assures MyLife's data will display in search results when a person searches for a scam victim's name.

42. After someone clicks on any one of Defendant MyLife's pages, a victim's name and other personal information is displayed together with an "estimated score." MyLife thereafter queries the records and databases of the Lexis Defendants (which MyLife has directly purchased from Lexis) to obtain information on the individual about whom the search is being conducted.

43. Allegedly, based on this information, MyLife then calculates an individual's so-called "final reputation score."

44. Defendant MyLife then displays the information on a "Report Page" (which importantly is nothing more than a reformatted Lexis report) once the search concludes.

45. The Lexis reports sold by MyLife, do not contain the aggregated information in the same form in which it was allegedly obtained from the third-party sources.

46. Instead, Lexis editorializes the information, giving its own (often incorrect) interpretation of the information it obtains: Mylife thereafter reprints these statements without attributing the source and without necessary disclaimers.

47. For example, Defendant Lexis incorrectly and deliberately interprets noncriminal "petty misdemeanors" issued in Minnesota (e.g., parking tickets commonly referred to as violations, not crimes) as "criminal records" and thereafter, states that individuals, Ms. Wanna included, who may have had such minor tickets, have "Criminal Court records."

48. Because petty misdemeanors are not crimes in Minnesota, this statement is patently false on its face.[4]

49. Plaintiff alleges that MyLife intentionally posts this false information supplied by Lexis to  cause maximum reputational harm (or the perception thereof) in an effort to extort payment from individuals.

50. Plaintiff alleges that Lexis is fully aware of MyLife's misuse of Lexis reports and information, but Lexis continues to sell to MyLife, as Lexis receives a direct and substantial profit and benefit from MyLife's illegal practices.

51. Plaintiff alleges that MyLife's website uses scare tactics to gain paid subscribers; further benefiting Lexis though the sale of reports.

52. By the summer of 2019, the Federal Trade Commission (hereinafter, "FTC") had received nearly 30,000 complaints from consumers about the MyLife website. Such volume of complaints caused the FTC to open an investigation into MyLife.

53. On November 1, 2019, Mr. Steve McFarland, President and CEO of the Better Business Bureau (hereinafter, "BBB") of Los Angeles and Silicon Valley, appeared on

---

[4] Minnesota Statute 609.02 Subdivision 4a. states: "'Petty misdemeanor' means a petty offense which is prohibited by statute, **which does not constitute a crime** and for which a sentence of a fine of not more than $300 may be imposed."

the ABC News "Good Morning America" television program and talked about consumers having complained to the BBB that the MyLife website uses scare tactics to gain paid subscribers. "They see a potential criminal record file and they're alarmed by it," Mr. McFarland said. Additionally, ABC News reported that "consumers have complained to the BBB that certain information about them was wrong and that the only way to fix it seemed to be to pay MyLife." Mr. McFarland explained: "There has [sic] been some consumers that have had bad information, they can't fix it. And their reputation is actually being harmed."

54. On July 27, 2020, the United States Department of Justice, implementing an enforcement action against MyLife which had previously been passed by a unanimous vote by the FTC, filed suit against Defendant MyLife and against its founder and CEO, Mr. Jeffrey Tinsley, in the United States District Court for the Central District of California, Western Division. The suit cited:

- Violations of the Fair Credit Reporting Act (hereinafter, "FCRA")
- Violations of the Telemarketing Sales Act
- Violations of the Restore Online Shoppers' Confidence Act
- Various other deceptive practices in violation of the FTC Act

55. The case, United States of America v. MyLife.com Inc. and Jeffrey Tinsley, was settled on December 15, 2021. U.S. District Judge John F. Walter entered a "Stipulated Order for Permanent Injunction and Equitable Monetary Relief" under which:

- Defendant MyLife was ordered to pay $16 million.
- Defendant Tinsley was ordered to pay $5 million.
- Defendants were ordered to stop falsely suggesting that background reports contain criminal or sex offender records.

- Defendants were ordered to settle the FTC enforcement action on violations of the FCRA and other consumer protection laws.
- Defendants were permanently restrained and enjoined from operating – directly or indirectly – as a Consumer Reporting Agency (hereinafter, "CRA").

56. Despite this Court order and throughout this litigation, Lexis continued to supply MyLife with protected consumer information from its databases. Plaintiff alleges that MyLife intentionally posts this false information supplied by Lexis to cause maximum reputational harm (or the perception thereof) in an effort to extort payment from individuals.

## II.    STATEMENT OF JURISDICTION AND VENUE

57. This Court has original subject-matter jurisdiction, as well as substantive Federal Question Jurisdiction over this proposed class action pursuant to 15 U.S.C. § 1681 et. seq. The Fair Credit Reporting Act ("FCRA"); Driver's Privacy Protection Act ("DPPA"); 18 U.S. Code § 2721et. seq., and 28 U.S.C. § 1332(d); the Class Action Fairness Act ("CAFA"); and, and procedurally with respect to the putative class, Fed. R. Civ. P. 23, et. seq.

58. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## III.    APPLICABLE STATUTORY LAW

59. The FCRA's requirements apply to any "Credit Reporting Agency" ["CRA"], which Section 603(f) defines as:

"[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or

evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

57. FCRA Section 603(d) defines a "consumer report" as:

"[A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under Section 604." 15 U.S.C. § 1681a(d).

60. CRAs that sell consumer reports must comply with the FCRA. Section 604 of the FCRA, 15 U.S.C. § 1681b, prohibits a CRA from furnishing consumer reports to persons whom it does not have a reason to believe have a permissible purpose to obtain the consumer report. FCRA Section 604 lists the "permissible purposes" for obtaining the reports allowed under the FCRA. 15 U.S.C. § 1681b(a)(3)(A)-(G).

61. Section 605(a) of the FCRA, 15 U.S.C. 15 U.S.C. 1681c(a) expressly prohibits a CRA from furnishing consumer reports containing information about bankruptcies, civil suits, civil judgements, tax liens, collection accounts, records of arrest and any other adverse information (other than convictions of crimes) that antedate the report by more than seven years.

62. Section 607(a) of the FCRA, 15 U.S.C. §1681e(a), requires a CRA to maintain reasonable procedures to limit the furnishing of consumer reports to the purposes permitted by FCRA Section 604, 15 U.S.C. § 1681b. The reasonable procedures mandated by Section 607(a):

    a.  Require the prospective users of the information to identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purposes;

    b.  The CRA must make a reasonable effort to verify the identity of a new prospective user and the uses for the consumer report certified by that prospective user before furnishing a consumer report; and

    c.  The CRA must limit the furnishing of consumer reports to the purposes listed under Section 604.

63. FCRA Section 607(b) requires a CRA to follow reasonable procedures to assure the maximum possible accuracy of consumer report information. 15 U.S.C. § 1681e(b).

64. The Driver's Privacy Protection Act ("DPPA") 18 U.S.C. §2721 et. seq. expressly forbids any person from releasing or publishing personal information obtained through or related to driver records, absent assurances that the receiving party has a legitimate purpose for obtaining the information.

## IV.   PARTIES AND KEY PERSONS

65. Plaintiff Ms. Wanna is an adult resident of Minnesota.

66. Key Person MyLife is a Consumer Reporting Agency incorporated in the State of Delaware but maintains its business headquarters at 1100 Glendon Avenue – Suite 1800, Los Angeles, California 90024. Founded in 2002 as Reunion.com, it merged with the search engine company Wink in 2008 and assumed its present name. Mr. Jeffrey Tinsley is its founder and Chief Executive Officer.

67. At least five related companies do business under the name LexisNexis (collectively these organizations are referred to as "Lexis" or "Lexis Defendants"), and the relationships between these companies are impossible to decipher without discovery -- as registrations and records appear to be conflicting and not properly updated. What is clear is that these defendant companies, including one or more located outside the United States, are working in concert, through a common enterprise, to collect private data and information about United States citizens, and are misleading the public and government officials in order to do so. The companies use this information in whole or in part to assist MyLife in the extortion of American citizens. In addition to key person MyLife, in a distribution now formally unknown, the Lexis Defendants share in the profits of extortion as well as civil and most likely criminal deception of motor vehicle officials across the country.

68. The Lexis companies involved are as follows:

   a. **_RELX Inc. d/b/a LexisNexis_**. This is a Massachusetts corporation (organized in Massachusetts on July 22, 1986) but maintains its principal office at 1105 North Market Street – Suite 501, Wilmington, Delaware 19801. [The registered agent is listed as CT Corporation System at 155 Federal Street -- Suite 700, Boston, Massachusetts 02110.] The Office of the Massachusetts Secretary of the Commonwealth states that the entity was previously named Reed Elsevier Inc. and changed to its present name on August 31, 2015. Mr. Nicholas Luff is listed as its President. The company purports to own and operate LexisNexis® Public Records, which is the organization with which

Defendant MyLife contracted to obtain its data (including protected driver data), including confidential information about Ms. Wanna and those of the putative Class.

    i.  RELX Inc. stores data about individuals (including that purported to be owned and protected by copyright by Reed Elsevier Inc.) in various databases.

    ii.  The company sells access to those databases for a fee.

    iii.  On information and belief, the data sold by RELX Inc. and/or for which RELX Inc. sold access was illegally obtained protected driver data and RELX Inc. and its managers knew of the illegal source of the data.

    iv.  On information and belief, RELX Inc. also knew the data it sold to MyLife would be used for the purpose of extortion.

    v.  RELX Inc. knew the data it provided to MyLife would be used by persons without a permissible purpose as defined by the DPPA, 18 U.S.C. $2721 et. seq., and the company sold and continues to sell data to MyLife knowing the same.

    vi.  RELX Inc. knew it would provide driver data to MyLife at the time it signed agreements with various state and local authorities, including the Minnesota Department of Public Safety's Driver and Vehicle Services Division, promising not to provide the data to persons using the data for personal or non-business purposes.

vii.   RELX Inc. may also be illegally using the name Reed Elsevier Inc., while claiming copyrights to the public data, including the protected driver data it obtains.

b.   ***Reed Elsevier Inc. d/b/a LexisNexis.*** Reed Elsevier Inc. is the organization which purports to own a copyright on the information collected, compiled, and sent to Defendant MyLife. As the purported owner of the formatted data, Reed Elsevier Inc. is alleged to know of, consent to, and actively participate in, the actions herein alleged. Despite presently operating, and despite claiming to own copyrights, "Reed Elsevier Inc." does not have a registered address in any state but, according to the Office of the Massachusetts Secretary of the Commonwealth, was organized in Massachusetts on July 22, 1986 and changed its name to RELX Inc. on August 31, 2015. [It is not known what, if any, relationship may exist with *Reed Elsevier US Holdings, Inc.* that Dun & Bradstreet reports as having a registered address at 1105 North Market Street – Suite 501, Philadelphia, Pennsylvania 19801. That entity is a subsidiary of the Dutch firm named *Elsevier B.V.*, headquartered at Radarweg 29, Amsterdam 1043 NX, Netherlands, which reportedly is a division of RELX Group plc. Additionally, the United States Securities and Exchange Commission (hereinafter, "SEC") lists two other "Reed Elsevier" entities located in the United States.]

c.   ***LexisNexis Risk Solutions Inc.*** This is a Georgia corporation (organized on January 20, 1975) and its principal office is at 1000 Alderman Drive,

Alpharetta, Georgia 30005. Mr. Mark Kelsey is its Chief Executive Officer.
[The Office of Georgia Secretary of State lists the entity's registered agent as
CT Corporation System at 289 South Culver Street, Lawrenceville, GA,
30046.] Lexis Nexis Risk Solutions Inc. is responsible for building and
compiling profiles on persons. The company uses a "LexID" system to link
records together, including private driver data. The company allowed
Defendant MyLife to use its data and provided the company its linking
services to link the illegally obtained driver data and illegally obtained court
records to individual profiles for sale to MyLife.

    i. With respect to assembly of MyLife profiles, LexisNexis Risk Solutions
Inc. touts its linking ability in its marketing materials, stating "When
LexisNexis gets a new record, it receives a unique identifier, its LexID.
Then, other records with intersecting data points are linked together
and given the same LexID, allowing it to be easily connected with still
other records associated with that LexID."

    ii. LexisNexis Risk Solutions Inc. uses this process to directly assist
MyLife in building profiles and reports about consumers for sale. As
such, LexisNexis Risk Solutions Inc. provides the instrumentality for
the sale of illegally obtained profiles to the end user.

d. **_LexisNexis Risk Solutions FL Inc._** This company is recorded as is a
Minnesota corporation (organized in Minnesota on December 21, 1994) but
lists with the Office of Minnesota Secretary of State its principal executive

office address as 1000 Alderman Drive, Alpharetta, Georgia 30004. Mr. Mark

Kelsey is listed as its Chief Executive Officer. The Office of Minnesota

Secretary of State lists the entity's registered agent as CT Corporation System

Inc. at 1010 Dale Street North, Saint Paul, Minnesota 55117. Going back at

least as far as 2007, this Lexis entity entered into detailed operating agreements

with MyLife as to MyLife's use of Lexis data and including Lexis' ongoing

review of MyLife's operations. While recording this business as a Minnesota

corporation appears to be in error, and yet another example of the Lexis

Entities failure to maintain proper business records, we must assume at this

time that Secretary's records are correct.

e. ***RELX Group, plc***. This is a foreign corporation and has a corporate address

of 1-3 Strand, London WC2N 5JR. RELX Group, plc owns and controls all

of the other Lexis entities and was aware of the illegal operations of the

subsidiaries. The leadership of RELX Group plc attempts to disclaim liability

for its illegal and tortious actions by use of a system of subsidiaries. However,

RELX Group plc leadership was aware of the actions of their managers and

was complicit in the illegal acts. RELX Group plc is also the funnel by which

the proceeds of the defendants' alleged criminal enterprise are filtered and

distributed to those who gain from their illegal acts. In short, despite its

misprision of a felony, RELX Group plc is a foreign corporation ultimately

responsible for:

- illegal data collection about Americans,
- the alleged criminal use of that data to extort them,

- later distribution of the profits from extortion, and
- mail and wire fraud with respect to illegally obtained driver data.

69. Key person Jeffrey Tinsley is the founder and Chief Executive Officer of MyLife. As the Chief Executive, Mr. Tinsley is the individual responsible for overseeing all operations of the company and he makes or authorizes all decisions -- including the decision to engage in the company's efforts to extort individuals though the public posting of illegally obtained and, in many cases, false, damaging information online. As Chief Executive, Mr. Tinsley knew of, authorized, and continued to operate the company in violation of state and federal law. Mr. Tinsley also has personal knowledge that MyLife continues to use certain business practices that MyLife agreed to cease in order to settle several lawsuits. Mr. Tinsley has transacted business in Minnesota and throughout the United States.

70. Key person Erik Engstrom is the Chief Executive Officer of RELX Group plc. As the Chief Executive Mr. Engstrom has, among other duties, the responsibility to assure that the company's revenues are not the result of illegal operations, including the proceeds of racketeering. Mr. Engstrom failed completely in this regard. In fact, Mr. Engstrom deliberately allowed and directed RELX Group plc to collect ill-gotten funds from its subsidiary, RELX, Inc. Mr. Engstrom further authorized the reinvestment of funds into RELX, Inc., including its ongoing racketeering efforts. Mr. Engstrom has knowingly facilitated the sale of illegal data in this District and throughout the United States.

71. Key person Nicholas Luff is the Chief Financial Officer of RELX Group plc and the President of RELX, Inc. and is directly responsible for the illegal *collection* of private driver data in violation of federal law as described herein. Mr. Luff is directly responsible for contracting with MyLife , knowing it would illegally *disclose* private driver data in violation of federal law. Mr. Luff has knowingly facilitated the *sale* of illegal data in this District and throughout the United States.

72. Key person Mark Kelsey is the Chief Executive Officer of both LexisNexis Risk Solutions Inc. and LexisNexis Risk Solutions FL Inc. He is directly responsible for continually producing revised Reseller Agreements between Lexis and MyLife, under which Lexis provides for MyLife's use of the Lexis data and under which Lexis maintains oversight of MyLife's operations.

73. Plaintiff Ms. Wanna is informed and believes, and thereon alleges, that at all times relevant, all Defendants individually and collectively, as part of a common enterprise, conducted business in the state of Minnesota.

## V.    FACTS COMMON TO ALL CLAIMS

### a.  Facts Common to All Claims Under the Driver's Privacy Protection Act 18 U.S.C. § 2721 Et. Seq.

74. The Lexis entities are "Person[s]" as defined by 18 USC § 2725(2).

75. The records sold by Lexis to MyLife contain Personal Information from Motor Vehicle Records, as the terms are defined by 18 U.S.C. § 2722(3) and (1) respectively.

76. Lexis offered for sale and disclosed Ms. Wanna's and other putative Class members' personal information to persons without a use permitted by 18 U.S.C. § 2721(b).

77. By disclosing records on the website without a permissible purpose, Defendants violated 18 U.S.C. § 2722(a).

78. MyLife and the Lexis Defendants similarly made false representations to various state motor vehicle departments and courts to obtain personal information from various individuals' motor vehicle records.

79. For example, to obtain records from the Minnesota Department of Public Safety's Driver and Vehicle Services Division, Defendants signed a document entitled "Records Access Agreement" which expressly stated: "The DVS data will not be used for personal or non-business purposes. Any such use is in violation of state and federal law."

80. Despite this express prohibition, the Lexis Defendants immediately transmitted data to MyLife (and other resellers), which the companies knew MyLife (and the other resellers) intended to supply – purposely, deliberately and willfully – to persons with no legitimate business purpose.

81. Furthermore, to obtain records from the Minnesota District Courts (a source of information used by the Lexis Defendants), the court system's Minnesota Public Access Remote (hereinafter, "MPA") requires acceptance of the following conditions:

"UNOFFICIAL RECORDS. The information available on MPA Remote is provided as a service and is not considered an official court record. The Minnesota Judicial Branch does not certify MPA Remote records or search results and is not responsible for any errors or omissions in the data found on MPA Remote. Certified civil judgment search results may be obtained from court administration."

And

"MPA SHOULD NOT BE USED FOR BACKGROUND CHECKS. Background checks should be conducted through the Minnesota Bureau of Criminal Apprehension's (BCA) Minnesota Public Criminal History Search (CHS) system, which you can access online at https://chs.state.mn.us/, at their office located at 1430 Maryland Avenue East in St. Paul, or by calling (651) 793-2400 for information. The BCA's CHS system links prior criminal history through fingerprints to verify the identification of the individual. MPA cannot provide this level of verification."

82. Despite certifying an understanding of these conditions, the Lexis Defendants sold MPA records as "official court records" with a disclaimer that such court records "may contain errors" -- a material misrepresentation.

83. Furthermore, the Lexis Defendants state that MPA records can and should be used for *background checks*, and in fact, allow users to certify *employment* and *background checks* as an official use of its records.

84. Moreover, in an agreement signed pursuant to Rules of Public Access to Records of the Judicial Branch, Rule 8, Subdivision 3, ¶(b), the Lexis Defendants falsely verified to the Minnesota State Court Administrator that they perform certain verifications prior to delivering court records to their users -- when, in fact, they do nothing to further verify the records.

85. By making false representations to various state motor vehicle departments and/or courts to obtain personal information from various individuals' motor vehicle records, MyLife and Lexis violated 18 U.S.C. § 2722(b).

86. It is highly pertinent here that Lexis (through its LexisNexis Risk Solutions Inc.) agreed to pay $5.13 million to settle a class action brought in the United States District Court for the Eastern District of North Carolina (Statesville Division),

Gaston v. LexisNexis Risk Solutions, Inc., 483 F. Supp. 3d 318 (W.D.N.C. 2020).

Plaintiffs Deloris and Leonard Gaston had brought a class action against Lexis for

the illegal sale of vehicular data protected under the DPPA. U.S. District Judge

Kenneth D. Bell, on September 2, 2020, granted Class status, granted injunctive relief

ordering Lexis to end its unlawful practices with respect to DPPA data, and set for

trial the issue of damages. Shortly thereafter, on November 3, 2020, Lexis settled the

class action for the $5.13 million.

87. By both illegally accessing and later selling data protected by the Driver's Privacy

Proction Act, Defendnat Lexis violated the Act, with respect to Plaintiff Wanna's

private data, and all that of the putative class.

### b. Facts Common to All Claims under the Fair Credit Reporting Act

88. Plaintiff and all persons about whom Defendant publishes and sells reports directly

or though their agent MyLife are individual "consumer[s]" as defined by 15 U.S.C. §

1679a(1) and § 1681a(c).

89. Lexis is a "Consumer Reporting Agency" ("CRA") as defined by the Fair Credit

Reporting Act, 15 U.S.C. § 1681a(f) because the company regularly uses the Internet

to collect and assemble consumer information and thereafter attempts to sell

consumer reports to third parties.

90. *Inter alia*, Lexis purports to assemble information from various sources including

"public information, gathered from government, social, and other sources".

91. Lexis's agent for the sale of its reports, MyLife actively promotes its background reports to third parties for use in employment, tenant screening, and other uses covered by the FCRA, and, in fact, MyLife's reports are used for such proposes.

92. MyLife expressly states in its marketing that its reports should be used for the purpose of "keeping yourself safe" from, *inter alia*, "home service providers", thereby directly affecting their employment.

93. MyLife is also a CRA as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f) because the company regularly *evaluates* other information for the purpose of furnishing consumer reports to third parties using the Internet. 15 U.S.C. §1681a(f)/ §603.

94. *Inter alia*, MyLife purports to review public records and other data, including income, and court records to determine a "reputation score", which the company then publishes on its consumer reports.

95. MyLife further states on its site that the reputation score it calculates is more important than a credit score and that a poor reputation as indicated by the score MyLife calculates may be used by some for the assessment of job applicants and business opportunities.

96. In fact, MyLife is a for profit business, having collected millions of dollars from American consumers seeking to purchase its reports, and millions more from other consumers paying to correct false and defamatory information Defendant MyLife has posted online. Lexis has shared in the profits of its agent MyLife.

97. Defendants' agent MyLife's disclosures, obtained directly from Lexis, constitute "consumer reports" as defined by 15 U.S.C. § 1681a(d) because Defendants' agent MyLife's reports, including that prepared with respect to Plaintiff Ms. Wanna, include information such as home value, annual income, court or arrest records, and bankruptcies, and purport to reflect the character, general reputation, personal characteristics, and/or mode of living of the subject.

98. MyLife promotes Lexis reports to the public for use in employment, tenant screening, and other uses covered by the FCRA and expects the background reports to be used for those purposes. 15 U.S.C. 1681a(d).

99. In fact, various individuals regularly consult Lexis reports sold by MyLife in making home service provider selections and selections about to whom to rent.

100.    MyLife actively markets Lexis consumer reports to individuals who are seeking to hire home service providers and others.

101.    Furthermore, Lexus' selling agent Mylife indirectly – and in some cases, directly – markets its "reputation score" to employers by touting the importance of assuring that the individuals with whom they do business have "good reputations". The Lexis defendants are fully aware of this and continue to supply defendants with

102.    In its advertising, Defendants' agent MyLife expressly acknowledges that its reputation scores may  be used by employers and asserts that failure to have a good reputation score on its site may result in loss of employment opportunity.

103.    Defendants' agent MyLife, despite disclaiming any liability under the FCRA in the site terms, does nothing to assure its reports are not used by potential employers.

104.    In fact, Defendants' agent MyLife allows individuals in various personal and business capacities to view reports even if they refuse to certify that they are not using the reports for employment purposes.

105.    It is also true that various uninformed individuals regularly consult Defendants' agent MyLife reports in making home service provider selections and hiring decisions.

106.    Defendants' agent MyLife sold and issued Lexis consumer reports concerning the proposed Class representative, Ms. Wanna, and putative Class members that also included false and inaccurate information.

107.    Various prospective employers seeking to employ Ms. Wanna and other proposed Class members have consulted Lexis consumer reports sold by MyLife.

108.    Other persons with no permissible purpose have also consulted the reports on Ms. Wanna and other proposed class members.

109.    The direct result of Defendant Lexis' false reports and unlawful disclosure has been significant damage to the reputations of Plaintiff Ms. Wanna and other proposed Class members, thereby impacting their employment opportunities and causing such individuals exceptional anxiety and personal psychological distress.

110.    Defendant Lexis' reporting has also resulted in an unwarranted intrusion into Plaintiff Ms. Wanna's and the other proposed Class members' personal affairs.

111.    As a result of Defendants' agent MyLife's conduct, Plaintiff Ms. Wanna and the putative class members herein have suffered from intrusion into their personal

affairs, defamation of character, anger, frustration, anxiety and, in some cases, loss of employment opportunity and general standing in the community.

112.    Defendants' agent MyLife, as part of its core business process, publicly displays consumer report information, including that of Ms. Wanna, to various persons who do not have a permissible purpose for receiving such information.

113.    Defendants' agent MyLife and Lexis presently possess information about the number of times a specific profile, including that of Plaintiff Ms. Wanna, has been viewed and the IP address of the viewer.

114.    Defendants' agent MyLife uses this data to send marketing emails to individuals containing the specific number of times a profile has been viewed.

115.    The IP addresses of users viewing reports can be used to identify viewers, including, in many cases, the physical address of the viewer.

116.    This data can be used to determine the exact number of views and, in many cases, the names and addresses of viewers.

### c.  Facts Regarding Violation of Section 604 of the FCRA 15 U.S.C. §1681b

117.    Section 604 of the FCRA, 15 U.S.C. 15 U.S.C. 1681(b) expressly prohibits a CRA from furnishing consumer reports to persons whom it does not have a reason to believe have a permissible purpose to obtain the report.

118.    Defendants' agent MyLife, however, has furnished Lexis consumer reports, in the form of its Background Reports, to MyLife subscribers -- without reason to believe those subscribers have permissible purposes to obtain such reports. Defendants' agent MyLife regularly provides such consumer reports without knowing

subscribers' purposes for obtaining the reports and without employing any due diligence or undertaking procedures for requesting and identifying each subscriber's purpose.

119.    Lexis knew of MyLife's actions and continued to supply the reseller with private data reports with the express intent of generating additional fees.

120.    Defendants' agent MyLife has, to date, admitted it furnishes its consumer reports to third parties and has attempted to circumvent Section 604 by arguing that the Lexis consumer reports it sells are not consumer reports as defined by the Act because the persons it allows to view its reports do not have a permissible purpose.

121.    Defendant Lexis knowingly sold its reports to the reseller MyLife and others knowing how the reports would be used and that the information they supplied would be sold to end-users and thereby violate Section 604.

122.    In so doing Lexis knowingly violated Section 604.

### d.  Facts Regarding Violation of Section 605(a) of the FCRA 15 U.S.C. §1681c(a)

123.    Section 605(a) of the FCRA, 15 U.S.C. 15 U.S.C. 1681c(a) expressly prohibits a CRA from furnishing consumer reports containing information about bankruptcies, civil suits, civil judgements, tax liens, collection accounts, records of arrest, and any other adverse information (other than convictions of crimes) that antedate the report by more than seven years.

124.    Lexis, however, routinely furnishes consumer reports containing adverse information that antedate more than seven years.

125.    Defendants' agent MyLife purports to base its reputation score pertaining to Plaintiff, Ms. Wanna, on civil matters and non-criminal traffic tickets occurring more than seven years in the past.

126.    Defendants' agent MyLife furnished its score to various users who freely viewed the obsolete information leading to Plaintiff Ms. Wanna's decreased "reputation score" and alleged "poor" standing in the community, all occuring as a direct result of Defendants' violation of the Act.

127.    Defendant Lexis knowingly sold its reports to the reseller MyLife and others knowing how the reports would be used and that the information they supplied would be sold to end-users, thereby violating Section 605.

128.    In so doing Lexis knowingly violated Section 605.

### e. Facts Regarding Violation of Section 607(a) & (b) of the FCRA 15 U.S.C. §1681e(a) & (b)

129.    Sections 607(a) and 607(b) of the FCRA expressly require that a CRA establish reasonable procedures to assure maximum possible accuracy of it reports and to assure that reports are obtained only by users with permissible purposes.

130.    Lexis failed to enact and maintain the procedures required by FCRA Sections 607(a) and 607(b).

131.    Instead, Lexis knowingly sold its reports to the reseller MyLife and others knowing how the reports would be used and that the information they supplied would be sold to end-users, thereby violating Section 607.

132.    In so doing Lexis knowingly violated Section 607.

133.    Any MyLife subscriber can obtain Lexis background reports without identifying themselves or certifying the purposes for which the background reports are sought. Users are also not required to certify that they will not use information in the background reports for other purposes.

134.    Lexis also fails to make reasonable efforts to verify the identity of new subscribers and to obtain certification by each subscriber about the intended use for the Background Reports.

135.    Similarly, Lexis fails to limit the furnishing of Background Reports to the purposes allowed by Section 604 and fails to assure maximum possible accuracy of the information in the Background Reports about the subjects of those Background Reports.

136.    Finally, Lexis also fails to provide the User Notice to persons to whom it provides Background Reports, as required by FCRA Section 607(d).

137.    As a direct result of Lexis' failure to employ the aforementioned procedures, Plaintiff Ms. Wanna's report and the reports of the members of the putative class were illegally and deliberately released to various persons -- unnecessarily intruding on Plaintiff's and the putative class' privacy, and right to privacy, as established by the Act.

138.    Similarly, as a further result of Lexis' failure to fulfill its statutory duty, Defendants' agent MyLife furnished reports pertaining to Plaintiff Ms. Wanna that contained false, misleading, and obsolete information, all causing Plaintiff personal financial loss and loss of standing in her community.

139.    Plaintiff Ms. Wanna was further harmed by incurring legal fees through consultation with lawyers and various experts regarding the course of action for seeking a remedy.

140.    Finally, Plaintiff Ms. Wanna suffered from loss of personal and professional time as a direct result of Lexis' refusal to remove the false and defamatory information and Lexis' refusal to comply with its statutory duties.

### f.  Facts Common to a Claim of Common Law Civil Conspiracy

141.    The Lexis Defendants conspired with MyLife and other companies to deprive millions of Americans of their right to their private driver data.

142.    MyLife and the Lexis Defendants illegally published the data for sale online and into publicly available webpages, in violation of the Driver's Privacy Protection Act, 18 U.S. Code § 2721et. seq.

143.    Plaintiff Ms. Wanna and members of the putative class were directly injured and harmed by the release of their private information in that persons with nefarious intent could access confidential financial and address information without a permissible purpose.

144.    Plaintiff Ms. Wanna may want to seek elective office in the future; thus, given the present polarizing nature of American politics, Ms. Wanna is rightfully concerned and suffers from anxiety regarding the "profit for sale" of her confidential information on the Internet and has suffered great harm as a result.

### g.  Facts Common to Claims under the Racketeer Influenced and Corrupt Organization Act (RICO) (Regarding all Defendants)

145.    The Lexis Defendants, MyLife, and other now unknown persons conspired to illegally obtain private driver data and to illegally disclose such information for the purpose of extortion.

146.    The Lexis Defendants' record of such actions constitutes not only a pattern, but an entire portion of their respective business enterprise is currently devoted to the extortion of Americans and the illegal invasion of their right to privacy.

147.    Lexis Defendants, MyLife, and other now unknown persons illegally posted Ms. Wanna's and members of the putative class' private data online, for sale to any person, including those without a legitimate business need.

148.    Lexis Defendants through their agent MyLife then demanded and continue to demand payment from affected persons to remove or edit the illegal data it posts.

149.    The Defendants engaged in a pattern and practice of such activity -- repeatedly deceiving state DMV officials by signing agreements without any intent to honor the agreements.

150.    Although no criminal charges have been filed to date, Defendants' willful violations of the DPPA are allegedly criminal in nature and may be prosecuted by the U.S. Department of Justice and state or local authorities in the future.

151.    Defendants engaged in an organized scheme and enterprise to defraud motor vehicle department officials across the country by repeatedly assuring such motor vehicle officials that the data they obtained would be used for specific business purposes by persons with a legitimate need for the data as required by statute -- when, in fact, the Defendants knew the data would be sold and marketed to persons with no legitimate business purpose.

152.    Without action by the courts, a pattern of similar unlawful violations of drivers' privacy threatens to continue into the future.

153.   The Defendants similarly have threatened, harassed, and extorted hundreds of

thousands if not millions of Americans and unless this Court grants relief, a pattern and

practice of similar unlawful acts threatens to continue into the future.

## VI.   Facts Regarding the Merits of Certifying a Class Action

154.   Plaintiff Ms. Wanna seeks to certify three Classes of harmed individuals.

155.   Plaintiff Ms. Wanna seeks Class certification pursuant to Fed. R. Civ. P. 23(a) and

(b)(1)(B), (2) and (3) related to Claims One and Two, for which monetary, injunctive, and

declaratory relief is sought.

156.   This Class is defined as: "All individuals whose consumer reports maintained by

Defendants have been disclosed to persons without a permissible purpose as defined by

15 U.S.C § 1681b"

157.   This Class is referred to as the "**FCRA Privacy Class**."

158.   Plaintiff Ms. Wanna also seeks Class certification pursuant to Fed. R. Civ. P. 23(a)

and (b)(1)(B), (2) and (3) related to Claims One, Two, and Three, for which monetary

and injunctive and declaratory relief is sought.

159.   This Class is defined as: "All individuals whom Defendants report as

having 'Criminal or Arrest Records' who in actuality *do not* have any such records."

160.   This Class is referred to as the "**Defamed Class**".

161.   Plaintiff Ms. Wanna also seeks Class certification pursuant to Fed. R. Civ. P. 23(a)

and (b)(1)(B), (2) and (3) related to Claims Four, Five, and Six, for which monetary and

injunctive and declaratory relief is sought.

162.    This Class is defined as: "All individuals for whom Defendants illegally acquired driver information and offered such information for sale on the Internet."

163.    This Class is referred to as the "**Driver Data Privacy Class**".

164.    A Class action is the only practicable means by which Plaintiff Ms. Wanna and unknown members of the **FCRA Privacy Class**, the **Defamed Class**, and the **Driver Data Privacy Class** can challenge Defendants' illegal disclosure of their consumer information.

165.    As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

166.    **NUMEROSITY:** The exact sizes of the Classes are unknown to Plaintiff Ms. Wanna at this time, but purportedly and on information and belief, they include millions of people who are putative Class members for purposes of this complaint. Accordingly, each Class plainly meets the numerosity requirement, thereby making joinder impracticable. Furthermore, based on the information provided on its website, MyLife claims it has obtained the Lexis records of more than 300 million public pages with information on "almost everyone in America". With regard to the **Defamed Class**, in Minnesota alone, Lexis has systematically reported hundreds of thousands of people with minor non-criminal driving infractions as incorrectly having a "criminal record".

167.    The **Defamed Class** consists of millions of people who cannot or will not be able to afford to retain counsel and litigate their cases through to judgment. The **FCRA Privacy Class** is forward-looking with the potential for new members to join the Class on an ongoing basis as young adults, new immigrants, and others establish public records.

168.    Finally, members of the three proposed Classes are spread out across Minnesota and the country, and include millions of low-income individuals who lack financial resources to fund the extensive factual research necessary to adequately plead this case. Given the complexity of this case, including tracing the transfer of data between various corporate entities, many of which have failed to maintain corporate records, bringing such a case would be cost-prohibitive for the Average American harmed. The putative members of all three Classes include countless young adults, persons presently engaged in job transitions, and persons searching for work after recent COVID-19 layoffs. These individuals are facing or have experienced Defendants' defamatory and otherwise inaccurate postings, frustrating their efforts to obtain new work. Thus, it is reasonable to assume they would also be unable to afford counsel to bring their own separate action against Defendants.

169.    **COMMONALITY:** All individuals comprising the proposed Classes are equally situated in that all individuals have been and are presently subjected to unauthorized release of their personal, private information otherwise protected under federal law.

170.    With regard to the **Defamed Class**, Defendant Lexis inaccurately and falsely posts that all individuals with similar minor driving violations, petty misdemeanors, or other non-criminal citations have "criminal or arrest" records -- a statement that is untrue.

171.    These false statements were amplified through Lexis' business partners and agents such as MyLife.

172.    For example, MyLife's practice is to attach to each name it lists the possibility that the individual is on a "sexual offender list." In Minnesota, the low possibility of that is

evident from population statistics: Minnesota has an adult (18 and older) population of 3.6 million people. Of that 3.6 million, approximately 18,000 are on the Minnesota Department of Public Safety's Predatory Offender Registry (commonly known as the "sex offender list). Thus, raising the "sex offender list" possibility and attaching it to the names of Plaintiff Ms. Wanna and the others in the putative Classes is inherently defamatory.

173.    It is well established law that professional fees incurred in attempting to remind consumer fraud and protect consumer rights constitutes injury in fact. Daniel J. Engstrom vs. Whiteburch, Inc., *et al*, 931 N.W.2d 786 (2019).

174.    Defendant MyLife and the Lexis Defendants are in violation of numerous provisions of the Minnesota Consumer Protection Act, Minn. Stat. 325F.69. For example, Minn. Stat.  325F.67 entitled "False Statement in Advertisement" and provides in pertinent part: "…an advertisement of any sort regarding merchandise…or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading…whether or not pecuniary or other specific damage to any persons occurs as a direct result thereof…" Id.

175.    In that regard, United States District Court Judge Robert G. Renner, in Kociemba v. G.D. Searle & Company, 680 F. Supp. 1293 (D. Minn. 1988) cited the Minnesota Consumer Fraud Act and expressly recognized it as applicable to advertising.

176.    Clearly, the defendants' representations that Plaintiff Ms. Wanna and the members of the putative Classes *might* have criminal records, and their agent's representations that she

and they *might* be on sex offender lists, attached highly charged negatives to their names and were inherently misleading and defamatory. By leading viewers to think such data might exist, defendants lured viewers into entanglement with both the MyLife and Lexis operations. Additionally, defendants' nefarious scheme was designed to induce individuals so listed to have their reputation scores (which had been developed by defendants) improved by defendants…but at a fee to be paid to Defendants' agent MyLife, a portion of which was passed directly to Lexis for the sale of its products.

177.    The Lexis Defendants, operating through their LexisNexis Risk Solutions FL Inc., entered into an unknown number of highly detailed contractual agreements with MyLife as to MyLife's use of Lexis data; those agreements provided for Lexis' ongoing review of MyLife's operations. Among those agreements were the following:

- A December 21, 2007 "Risk & Information Analytics Group Reseller Agreement" under which Lexis would provide data to MyLife (operating then under its earlier name, Reunion.com, Inc.) that would then be resold.

- On February 26, 2008, that agreement was amended.

- An April 8, 2011 "Risk Solutions Reseller Agreement" (hereinafter, the "2011 Agreement") with MyLife (operating by then as MyLife.com, Inc.) that superseded and replaced the earlier agreement as amended. The 2011 Agreement ran though December 31, 2015, at which time it was scheduled to automatically renew for successive one-year terms unless terminated by either party.

- On information and belief, that agreement has not been terminated for 2023 despite the DOJ enforcement action.

- The 2011 Agreement contained provision "4.2" entitled "LN Teaser Results" that stated in part, "In order to allow Reseller [MyLife] to market the services of Reseller's [MyLife's] Web Properties to consumers, Reseller [MyLife] shall be permitted [by Lexis]to allow individual consumer Customers to view LN Teaser Results…" Significantly, this provision demonstrates the close connection between Lexis and MyLife and provides additional evidence that the Lexis Defendants *actively enabled* the end uses of the data they agreed to sell to MyLife, on an ongoing basis.

- The First Amendment to the 2011 Agreement was entered into on July 17, 2013.

- The Second Amendment to the 2011 Agreement was entered into on April 1, 2014.

- The Third Amendment to the 2011 Agreement was entered into on July 1, 2015.

- The Fourth Amendment to the 2011 Agreement was entered into on March 1, 2016.

- The Fifth Amendment to the 2011 Agreement was entered into on January 1, 2017.

- The Sixth Amendment to the 2011 Agreement was entered into on May 11, 2017.

- The Seventh Amendment to the 2011 Agreement was entered into on October 1, 2019.

- The Eighth Amendment to the 2011 Agreement was entered into on November 1, 2019.

- The Ninth Amendment to the 2011 Agreement was entered into on November 30, 2019.

- What is self-evident from the series of Amendments is the close attention Lexis pays to the ongoing operation of MyLife as it continually fine-tunes the interaction between the firms and as it exercises oversight with respect to MyLife's operations.

178.  Accordingly, Plaintiff raises claims based on questions of law and fact that are common to, and typical of, the putative Class members of the three Classes she seeks to represent. Common questions of fact include:

    a.  Whether Defendant MyLife assures that persons accessing their reports have a permissible purpose.

    b.  Whether Defendant MyLife states that individuals without criminal records have such records.

    c.  Whether individuals have suffered harm.

179.  <u>Common questions of law</u> include:

    a.  Whether individuals with minor non-criminal driving offences can be said to have "criminal or arrest records;"

    b.  Whether the Communications Decency Act immunizes the Lexis Defendants;

    c.  Whether MyLife is a reseller as defined by the FCRA and the legal ability of the Lexis Defendants for the actions of MyLife;

179.    The relief sought for each proposed Class is common to all members of that respective Class. Plaintiff Ms. Wanna seeks relief declaring All Lexis Defendants to be defined as a CRA as defined by 15 U.S.C. 1681a(f) and declaring that MyLife was an agent of Lexis in selling its reports as defined by 1681a(d). She additionally seeks: (a) an order requiring Defendant Lexis to assure that users of its reports have a permissible purpose, (b) monetary relief for past unauthorized disclosures; (c) monetary relief for Defendant Lexis' failure to assure maximum possible accuracy of its reports; and/or (d) in the alternative, monetary relief for Defamation.

180.    **TYPICALITY:** The claims of Plaintiff Ms. Wanna are typical of the claims of the **FCRA Privacy Class**, as Plaintiff and all members have suffered and will continue to suffer harm from the unauthorized disclosure of their personal information.

181.    The claims of Plaintiff Ms. Wanna are typical of the claims of the **Defamed Class** as Plaintiff and all members have suffered and will continue to suffer the same direct, irreparable injury, including loss of reputation and general standing in the community.

182.    Because Plaintiff Ms. Wanna and the putative Class members challenge the same conduct of all Defendants, the Defendants will likely assert similar affirmative defenses against Plaintiff and the proposed Class members. Moreover, the answer to whether the Defendants are a CRA and issue consumer reports as defined by the FCRA; and, whether various statutory immunities are applicable to Defendants (including the CDA) will determine the success of the claims of the named Plaintiff and every other proposed Class member. If Plaintiff succeeds in the claim that Defendant Lexis has violated the

FCRA and that the CDA does not apply with respect to defamation, that ruling will likewise benefit every other member of the proposed Class.

183.    The question of whether MyLife is a CRA has already been placed before the United States District Court for the District of Minnesota. In Finlay v. MyLife.com Inc., 525 F.Supp. 3d 969, U.S. District Court Judge Susan Richard Nelson on March 16, 2021 denied MyLife's motion to dismiss a complaint brought by a plaintiff with remarkably similar facts as pertain here.  In that case, plaintiff Finlay alleged, *inter alia*, that MyLife is a CRA and as such, both willfully and negligently, failed to comply with the FCRA. In denying MyLife's motion to dismiss, Judge Nelson found that the plaintiff had standing due in part to plausibly alleging actual injury-in-fact that was both particularized and concrete. Furthermore, Judge Nelson found that the plaintiff adequately alleged that MyLife provides "consumer reports" as defined by the FCRA. Additionally, Judge Nelson found that the plaintiff plausibly alleged "that MyLife is a CRA… and is subject to the FCRA…"

184.    With additional information gathered in that case and related matters, Plaintiff can now establish that MyLife was a reseller of Lexis' reports and concealed this information, including the source of its information to the purchasing public.

185.    Lexis is known to be aware of this conscious effort of its agent to conceal and protect Lexis from actions such as this.

186.    **ADEQUACY:** Plaintiff Ms. Wanna will fairly and adequately represent the interests of the proposed Classes she seeks to represent.

187.    Plaintiff Ms. Wanna's interests align with that of the putative class. Accordingly, she

has no interests separate from, or in conflict with, those of the proposed putative Classes

she seeks to represent; therefore, she seeks no relief other than the monetary, declaratory,

and injunctive relief sought on behalf of the proposed Classes.

188.    **Rule 23(b)(2):** Class action status under Rule 23(b)(2) is appropriate because all

Defendants have acted or failed and/or refused to act on grounds that generally apply to

the proposed Classes, such that preliminary and final monetary, injunctive, and

declaratory relief is appropriate and necessary with respect to each member of all Classes.

Specifically, pursuant to the FCRA, Defendant Lexis has automatically and systematically

produced defamatory reports in violation of the FCRA—without adopting procedures to

assure maximum possible  accuracy (or, in actuality, has assented to its agents adopting

procedures to willfully misstate information  about individuals) and has freely distributed

consumer reports without assuring a permissible purpose as required by the statute.

These acts and omissions are generally applicable to all of the proposed Classes.

Similarly, Defendant Lexis has added to third party content in an effort to cause the

information to have as negative of an effect as possible on consumer reputations and, in

so doing, has systematically defamed individuals -- that is generally applicable to the

**Defamed Class**.

189.    Accordingly, (a) a declaration that MyLife is a pass-through of Lexis records and must

act as such; (b) an injunction prohibiting Defendant Lexis from proving reports to

MyLife without assuring maximum accuracy; (c) an injunction that prohibits Defendant

Lexis from distributing reports to MyLife without assuring individuals and companies

obtaining them certify a permissible purpose; and (d) <u>monetary relief</u> for all individuals harmed by Defendant Lexis's illegal content to date, would benefit every member of each of the proposed Classes.

190.    **Rule 23(g):** Plaintiff respectfully requests that the undersigned be appointed as Class Counsel. Counsel is exceedingly experienced in complex litigation and class actions for over 30 years. Further, Counsel is well suited to represent the class as Counsel have extensive experience representing individuals and classes of individuals in matters involving complex consumer rights matters in federal court and have ample knowledge of the relevant  statutory law. Counsel has previously litigated matters against the key person MyLife in federal court and before the American Arbitration Association. Given such experience, Counsel is well educated in MyLife's practice of violating the FCRA and the defenses previously asserted by the company. Counsel is similarly  financially capable of hiring additional subject matter experts and subordinate counsel with extensive experience in class-action litigation. Counsel have the resources, expertise, and experience to prosecute this action.

## FIRST COUNT

Willful Noncompliance with the FCRA
(On behalf of Plaintiff and the **FCRA Privacy Class** and the **Defamed Class**)
(Against All Defendants)

195.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

196.    Defendant Lexis willfully failed to comply with the requirements of FCRA, including but not limited to:

a.  Failing to comply with the requirements of Section 604, 15 USC § 1681b, in assuring that users of its reports have a permissible purpose for accessing the information;

b.  Failing to comply with the requirements of Section 605(a), 15 USC § 1681c(a) by limiting obsolete consumer information contained in its reports;

c.  Failing to institute and follow reasonable procedures to limit the furnishing of consumer reports to the purposes listed under section 1681b of the FCRA, as required by Section 607(a), 15 USC § 1681e(a); failing to institute and follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning Plaintiff Ms. Wanna, as required by Section 607(b), 15 USC § 1681e(b);

197.   As a result of Defendant Lexis's failure to comply with the requirements of FCRA, Plaintiff Ms. Wanna, who has suffered from a traumatic brain injury, has suffered and continues to suffer, actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with her normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry, and related health problems, for which Plaintiff seeks damages in an amount to be determined by the jury. Plaintiff also seeks, upon proper motion at the time, punitive damages in an amount to be determined by the jury.

201.   Plaintiff Ms. Wanna requests attorney's fees pursuant to 15 USC § 1681n(a).

## SECOND COUNT

Negligent Noncompliance with the FCRA
(Plead in the Alternative on behalf of Plaintiff and the **FCRA Privacy Class**

and the **Defamed Class**)
(Against All Defendants)

198.    Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

199.    Defendant Lexis negligently failed to comply with the requirements of the FCRA, including but not limited to:

    a.    Failing to comply with the requirements of Section 604, 15 USC § 1681b, in assuring that users of its reports have a permissible purpose for accessing the information;

    b.    Failing to comply with the requirements of Section 605(a), 15 USC § 1681c(a) by limiting obsolete consumer information contained in its reports;

    c.    Failing to institute and follow reasonable procedures to limit the furnishing of consumer reports to the purposes listed under section 1681b of the FCRA, as required by Section 607(a), 15 USC § 1681e(a);

    d.    Failing to institute and follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning Plaintiff Ms. Wanna, as required by Section 607(b), 15 USC § 1681e(b);

200.    As a result of Defendant Lexis's failure to comply with the requirements of FCRA, Plaintiff Ms.Wanna and all potential class members have suffered, and continue to suffer, actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear,

worry, and related health problems, for which Plaintiff and the Class members seek damages in an amount to be determined by a jury.

201.     Plaintiff Ms. Wanna requests attorney's fees pursuant to 15 USC § 1681o(a).

## THIRD COUNT

Common Law Defamation
(Plead in the Alternative on behalf of Plaintiff and the **Defamed Class**)
(Against All Defendants)

202.     Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

203.     Defendant's agent MyLife publicly posted false information about Plaintiff; to wit: "Melissa Wanna: ALERT: Court Records Found." NOTE: That warning was posted in red ink, thus increasing its negativity toward Ms. Wanna.

204.     Defendant Lexis, by and through its agent, in an effort to raise the stakes, further stated, "Melissa Wanna: information gathered might include sensitive details gathered from Civil & Criminal Court records, & sexual offender list…Profile may contain sensitive information and graphic content."

205.     Defendant Lexis's statement, by and through its agent, that Ms. Wanna's report might contain sexual offender data and graphic content was known to be false at the time MyLife made the statement.

206.     Said statements regarding Plaintiff Ms.Wanna's arrest or criminal records were false in that  Plaintiff has no criminal or arrest record.

207.    Defendant Lexis made these statements on the Internet generally, and specifically to all persons described in Defendants' agent MyLife's records by IP addresses.

208.    Defendant Lexis intended to harm Plaintiff Ms. Wanna and thereby incentivize her to pay money to purchase.

209.    Defendant Lexis' statements, made directly and through its agent, did, indeed, harm Plaintiff Ms. Wanna's reputation and standing in the community.

210.    Defendant's actions constitute defamation *per se*.

## FOURTH COUNT

Violation of the Drivers' Driver's Privacy Protection Act. 18 U.S. Code § 2721et. seq.
(On behalf of Plaintiff and the **Driver Data Privacy Class**)
(Against All Defendants)

211.    The DPPA statute is 18 U.S. Code Chapter 123 and is entitled "Prohibition on Release and Use of Certain Personal Information from State Motor Vehicle Records."

212.    Section 2724 of the Statute is entitled "Civil Penalties" and provides in its entirety the following:

a.    **Cause of Action:** A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States District Court.

b.    **Remedies:** The court may award:

1.    actual damages, but not less than liquidated damages in the amount of $2,500;
2.    punitive damages upon proof of willful or reckless disregard of the law;

      3.  reasonable attorneys' fees and other litigation costs reasonably incurred; and

      4.  such other preliminary and equitable relief as the court determines to be appropriate.

213.     Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

214.     By making false representations to various state motor vehicle departments and/ or courts to obtain personal information from various individual's motor vehicle records. MyLife and Lexis violated 18 U.S.C. § 2722(b).

215.     By disclosing personal information from a motor vehicle record, for uses not permitted under 18 U.S.C. § 2721(b), Lexis violated 18 U.S.C. § 2722(b).

216.     By utilizing such illegally obtained personal information against Plaintiff, Lexis is liable to Ms. Wanna and all other affected individuals pursuant to 18 U.S.C. § 2724.

## FIFTH COUNT

Common Law Civil Conspiracy
(On behalf of Plaintiff and the **Driver Data Privacy Class**)
(Against All Defendants)

217.     Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

218.     The Lexis Defendants conspired to illegally obtain Plaintiff Ms. Wanna's data and that of the Class she seeks to represent.

219.     MyLife and the Lexis Defendants further conspired to make Plaintiff Ms. Wanna's data, and that of the Class she seeks to represent, available to anyone on the Internet willing to pay.

220.     The Lexis Defendants, complicit with their agent MyLife, further conspired to avoid the legal repercussions of their illegal arrangement in making Plaintiff Ms. Wanna's data and that of the Class she seeks to represent available to anyone on the Internet willing to pay.

## SIXTH COUNT

Violation of the Racketeer Influenced and Corrupt Organization Act (RICO)
18 U.S. Code § 1961 et. seq.
(On behalf of Plaintiff and the **Driver Data Privacy Class**)
(Against All Defendants)

221.     Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

222.     The Lexis Defendants conspired with their agent MyLife to illegally obtain private driver data and illegally disclose such information for the purpose of extortion.

223.     In doing so, the defendants engaged in predicate acts necessary for a RICO claim including both §1961(a) acts of extortion, coercion, AND §1961(b) acts of conspiracy, wire fraud, fraud and related activity in connection with identification documents (18 U.S. Code § 1028), and mail fraud.

224.     The Defendants collectively have operated and maintained organizations engaged in interstate commerce (namely website data providers) while engaged in a pattern of racketeering activity.

225.     As such, the Defendants have violated 18 U.S.C. 1962(b).

226.     The Defendants have similarly invested into the continued operations of the organizations while engaging in a pattern of racketeering activity.

227.     As such, the Defendants have violated 18 U.S.C. 1962(a).

228.     Key persons and Defendants Jeff Tinsley, Minh Tran, Erik Engstrom, Nicholas Luff, and Mark Kelsey, individually and as corporate officers, all directed alleged criminal enterprises and directly participated in their affairs.

229.     These individuals similarly allegedly engaged in a misprision of a felony, utilizing a series of corporations to shield themselves from clearly felonious behavior.

230.     As such the Defendants have violated 18 U.S.C. 1962(c).

231.     In executing agreements and coordinating their efforts to illegally obtain private driver data and to thereafter use the same to extort individuals for profit, defendants conspired to commit illegal acts and therefore violated 18 U.S.C. 1962(d).

232.     Plaintiff Ms. Wanna and the putative Class have been gravely injured by such illegal conduct.

## SEVENTH COUNT

Violation of the Minnesota Consumer Protection Statutes
Minn. Stat. 325F
(On behalf of Plaintiff and the **FCRA Privacy Class**, the **Defamed Class**, and the **Driver Data Privacy Class**)
(Against All Defendants)

233.     Plaintiff Ms. Wanna incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

234.     Minn. Stat. 325F includes the False Statement in Advertising Act (325.67) and the Prevention of Consumer Fraud Act (325.68-70).

235.     These laws are remedial statutes and are to be broadly construed to protect the consuming public.

236.      Minn. Stat. 325D includes the Unlawful Trade Practices Act (325D.09-15) and adoption of the Uniform Deceptive Trade Practices Act (325D.43-48).

237.      The broad construction that courts have given to the statutes: Although there must have been a transaction for goods or services, "merchandise" includes intangibles, loans, and real estate. Similarly, advertising includes "both direct and indirect outreaches to the public." The false or misleading conduct does not require statements that are literally false. Also, failure to disclose information can be a misleading practice.

238.      Citing the Minnesota statutes, The U.S. Court of Appeals for the Eighth Circuit wrote in the 1985 case of <u>Cashman V. Allied Products Corp.</u> , 761 F.2d 1250: "It is not necessary that the one who makes the misrepresentation knows that it is false." It is sufficient if the statement that turns out to be false was made without knowledge as to whether it was true or false.

239.      As presented in the previous paragraphs of this Complaint, the Defendants' conduct is in violation Minnesota's Consumer Protection Statutes.

### *Prayer for Relief*

WHEREFORE, Plaintiff Ms. Wanna, by and through her attorneys, respectfully prays for a reasoned Award in favor of Plaintiff and against Defendants as follows:

      a.      attorney's fees pursuant to 15 USC § 1681n(a), 18 U.S.C. § 2724(b)(3), and 18 U.S.C. § 1964(c);

      b.      three times all actual compensatory damages suffered;

c.      statutory damages in an amount up to $1,000.00 per violation per

plaintiff, pursuant to 15 U.S.C. §1681n;

d.      liquidated damages of at least $2,500.00 per violation per plaintiff,

pursuant to 18 U.S.C. § 2724(b)(1);

e.      punitive damages when properly pleaded at a time set by the Court's

schedule;

f.      disgorgement of all ill-gotten gains;

g.      injunctive relief prohibiting such conduct in the future;

h.      reasonable attorney's fees, litigation expenses, and cost of suit; and

i.      any other relief deemed appropriate by this Honorable Court.


Dated: June 1, 2023                          **MADGETT LAW, LLC**

                                             s/ David J.S. Madgett
                                             David J.S. Madgett (#0390494)
                                             333 South 7th Street -- Suite 2450
                                             Minneapolis, MN 55402-2429
                                             P: (612) 470-6529
                                             dmadgett@madgettlaw.com