UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MELISSA WANNA, individually and on behalf of others similarly situated, | Case No. 23-CV-1769 (PJS/JFD) |
| Plaintiff, | |
| v. | ORDER |
| RELX GROUP PLC, REED ELSEVIER INC. d/b/a LexisNexis, RELX INC. d/b/a LexisNexis, LEXISNEXIS RISK SOLUTIONS INC., and LEXISNEXIS RISK SOLUTIONS FL INC., | |
| Defendants. | |

---

David J.S. Madgett, MADGETT & KLEIN, LLC, for plaintiff.

Joseph G. Schmitt, NILAN JOHNSON LEWIS PA; Joshua Daniel Davey and Ronald I. Raether, Jr., TROUTMAN PEPPER HAMILTON SANDERS LLP, for defendants.

Plaintiff Melissa Wanna brings this putative class action against a group of related defendants to whom the Court will refer as "Lexis." Wanna alleges that Lexis violated various federal and state laws when it publicly disclosed information about her. Lexis now moves to dismiss Wanna's complaint. For the reasons explained below, the Court grants the motion as to Wanna's federal claims and declines to exercise supplemental jurisdiction over her state-law claims.

## I. BACKGROUND

Lexis owns and operates a service called LexisNexis Public Records, which obtains data from various sources and compiles the data into dossiers on individuals. Compl. ¶¶ 15, 68(c), 89–90, ECF No. 1. Lexis then sells its data to others, including MyLife.com Inc. ("MyLife"). Compl. ¶¶ 1, 17, 68(d). Lexis sells its data to MyLife pursuant to data-licensing agreements, the first of which took effect in 2007, and the last of which took effect in 2011. Compl. ¶¶ 68(d), 177. The 2011 agreement renews annually until terminated. Compl. ¶ 177.

MyLife operates a website that sells reports on individuals directly to the public. Compl. ¶¶ 5–12, 18, 29. The MyLife website consists of individual profile pages on millions of people. Compl. ¶ 12. Those profiles are principally derived from the data that MyLife purchases from Lexis, with minor input from other sources. Compl. ¶ 13. Each profile includes a "reputation score," which MyLife calculates based on data purchased from Lexis. Compl. ¶¶ 42–45, 94–95. MyLife's reputation scores, as well as tantalizing warnings that a person's profile might contain graphic information or information from criminal records, are viewable to anyone who navigates to MyLife's website. Compl. ¶¶ 4–5, 40–44. Some of this information is also presented in "teaser" pages that appear in search-engine results without a user ever visiting the MyLife website. Compl. ¶¶ 40–41, 177.

At some point, Wanna typed her own name into a search engine, and the top result of the search was MyLife's profile page on her.  Compl. ¶¶ 3–5.  Upon navigating to her MyLife profile, Wanna learned that she had a poor "reputation score" of "1.85–3.79."  Compl. ¶¶ 5–8.  Wanna's profile also stated "ALERT: Court Records Found" in red ink, and generally warned that the profile contained potentially graphic information.  Compl. ¶¶ 5, 9–10.  Users were told that they could pay a fee to MyLife to see additional information about Wanna.  Compl. ¶¶ 11, 19.  At the same time, Wanna herself could pay a fee to MyLife to correct or even remove her profile.  Compl. ¶¶ 31–34.  At the time that Wanna learned of her profile, she was looking for a job.  Compl. ¶ 3.  Prospective employers who searched for information about Wanna would have been met with Wanna's MyLife profile and its ominous warnings.  Compl. ¶¶ 3, 107.

Wanna filed this action in June 2023.  Wanna did not sue MyLife, because the company had filed for bankruptcy in September 2022.  Compl. ¶ 1, 7 n.1.  Instead, Wanna sued Lexis—the company from whom MyLife had purchased much of the data that it used.  Lexis now moves to dismiss Wanna's lawsuit.

## II. ANALYSIS

### A. Standing

Article III of the U.S. Constitution limits federal judicial power to "cases" and "controversies."  U.S. Const. Art. III § 2.  If the plaintiff does not have a "personal stake" in the outcome of a lawsuit, then the lawsuit does not present a case or controversy, and the plaintiff does not have standing.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).  A plaintiff establishes Article III standing by demonstrating that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560).  "Concreteness is determined by assessing 'whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms' such as reputational harm" and emotional injury.  *Schumacher v. SC Data Center, Inc.*, 33 F.4th 504, 509 (8th Cir. 2022) (quoting *Ramirez*, 594 U.S. at 417);

*Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (finding standing based in part on concrete harm of emotional distress).

"At the pleadings stage, general factual allegations suffice to support standing." *Rydholm*, 44 F.4th at 1108 (citing *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020)); *In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("[S]tanding under Article III presents only a 'threshold inquiry,' requiring 'general allegations' of injury, causation, and redressability." (cleaned up)).  In determining whether plaintiffs have standing, courts "must assume that on the merits the plaintiffs would be successful in their claims." *Rydholm*, 44 F.4th at 1108 (quoting *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016)).  "Plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *Ramirez*, 594 U.S. at 431.

In this case, Wanna pleads monetary, reputational, and emotional harms as a result of Lexis's alleged violations of the Fair Credit Reporting Act ("FCRA"), the Driver's Privacy Protection Act ("DPPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and Minnesota consumer-protection statutes, as well as common-law defamation and civil conspiracy.  Compl. ¶¶ 111, 138–40, 197, 200, 209, 214, 223, 239.  Specifically, Wanna alleges that MyLife was an agent of Lexis, and that Lexis (through its agent MyLife) unlawfully published confidential or false information about her on the MyLife website and on search engines.  Compl. ¶¶ 40–42, 49.  Wanna

alleges that publication of this information caused her to lose employment

opportunities and harmed her standing in her community.  Compl. ¶¶ 106–12.

As is evident, Wanna does not allege a bare procedural violation of these statutes

unconnected to a concrete harm.  Wanna is not complaining that "inaccurate or

misleading information sits in a company database."  *Ramirez*, 594 U.S. at 434.  Instead,

Wanna alleges that inaccurate or misleading information that Lexis had illegally

published about her (through its agent MyLife) was viewed by prospective employers

during her job search and influenced those prospective employers to decline to offer her

jobs.  Compl. ¶¶ 3, 107, 111–12; *see Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969, 977 (D.

Minn. 2021) ("[Plaintiff's] status as a job-seeker and the widespread availability on the

Internet of the allegedly false consumer information about him—give rise to a

reasonable inference that a third-party viewed that information on his MyLife profile.");

*Rydholm*, 44 F.4th at 1108 ("Drawing reasonable inferences for Rydholm leads to the

assumption that his TransUnion and Experian credit reports were disseminated to third

parties.").

In sum, Wanna alleges tangible monetary harms arising from Lexis's alleged

violations of federal and state law, including the loss of job opportunities.  Moreover,

Wanna alleges intangible harms—including reputational injury and emotional

distress—that are closely related to traditional common-law causes of action such as

defamation, invasion of privacy, and intrusion upon seclusion.  *See Ramirez*, 594 U.S. at

432.

Wanna's allegations seem sufficient to establish injury-in-fact.  Lexis disagrees,

however, arguing that *Ramirez* requires Wanna to allege more.  According to Lexis,

*Ramirez* requires that, to adequately allege injury-in-fact, Wanna must allege the *specific*

*identities* of third-party viewers of her MyLife profile and identify *specific adverse*

*decisions* taken by those viewers as a result of reviewing the profile.  ECF No. 27 at

16–18.[1]

*Ramirez* requires no such thing.  In *Ramirez*, the plaintiffs alleged violations of

FCRA when TransUnion falsely associated them with terrorism, drug trafficking, and

other serious crimes on their credit reports.  *Ramirez*, 594 U.S. at 432.  Before trial, the

parties reached a stipulation in which they identified which class members had their

credit reports disseminated to third parties.  *Id.* at 421.  These class members alleged

that they had been harmed by that dissemination.  *Id.* at 433.  The remaining class

members—i.e., those whose reports had *not* been disclosed to any third party—alleged

that they were nevertheless harmed by the mere existence of the false information on

TransUnion's internal database and the risk that, at some time in the future, the false

information might be disseminated in some way.  *Id.* at 35.

_____

[1]When citing documents by ECF number, the Court cites to the page numbers
generated by the Court's docketing system.

-7-

*Ramirez* held that only the former group—i.e., those class members whose reports had been disseminated—had standing. *Id.* at 442. In reaching that decision, *Ramirez* did not rely on the fact that the recipients of the reports had been identified, nor did *Ramirez* require the plaintiffs to identify a particular adverse consequence that had resulted from a particular creditor being influenced by a particular report. *Id.* at 432–33. Instead, *Ramirez* held that *dissemination alone* gave rise to an injury-in-fact. *Id.* at 433.

Wanna's situation is identical to that of the class members who were found to have standing in *Ramirez*. Like them, she alleges that the dissemination of the information caused her harm. And here, as in *Ramirez*, such an allegation is sufficient to establish injury-in-fact.

Lexis next argues that the alleged harms are not fairly traceable to Lexis but rather are the result of the intervening conduct of MyLife, a third party. ECF No. 27 at 18–22. In support, Lexis contends that Wanna has not plausibly pleaded that MyLife was its agent, and that, in the absence of an agency relationship between Lexis and MyLife, Wanna's injuries are not traceable to Lexis. But "attacks on the sufficiency of [a plaintiff's] allegations are more properly directed at whether the complaint states a claim, not whether [a plaintiff] has alleged standing." *In re SuperValu, Inc.*, 870 F.3d at 773 (citing *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 936 (8th Cir. 2012)).

Further, even without the agency relationship, the complaint alleges that Lexis is a but-for cause of Wanna's injury because it sold Wanna's information to MyLife.

For these reasons, the Court finds that Wanna's allegations are sufficient to establish standing.  Wanna has alleged that she has suffered an injury-in-fact, that her injury is fairly traceable to Lexis, and that her injury is likely to be redressed with a favorable judgment.  Nothing more is required.

### B. Failure to State a Claim

### 1. Standard of Review

In reviewing a motion to dismiss for failure to state a claim, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.

At the motion-to-dismiss stage, the Court may consider the complaint and documents "necessarily embraced by the complaint," including "documents whose contents are alleged in a complaint and whose authenticity no party questions . . . ." *Rossi v. Arch Ins. Co.*, 60 F.4th 1189, 1193 (8th Cir. 2023) (quoting *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017)).  Lexis has submitted a copy of the 2011

agreement between Lexis and MyLife that is referred to and quoted in the complaint, and whose authenticity is not disputed.  Therefore, the Court will consider the 2011 agreement.  The Court will not, however, consider the affidavit or exhibit submitted by Wanna's counsel, as doing so would require the Court to convert Lexis's motion to dismiss into a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d).

### 2. Agency Relationship

Wanna's claims are largely premised on her allegation of an agency relationship between Lexis (as principal) and MyLife (as agent).  "In order to rely upon an agency theory, a plaintiff must plead facts demonstrating the elements of an agency relationship."  *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 873 (D. Minn. 2012) (citations omitted).  "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 333 (8th Cir. 1996) (quoting Restatement (Second) of Agency § 1). "An agent can bind a principal through actual authority, either express or implied, and through apparent authority."  *New Millennium Consulting, Inc. v. United HealthCare Servs., Inc.*, 695 F.3d 854, 857 (8th Cir. 2012) (citations omitted).

"Actual authority is that authority given by the principal to the agent to act on its behalf, and it requires that the principal manifest its consent to the agent's ability to

bind the principal." *Id.* (citation omitted).  Actual authority "must be traced to the

principal's dealings with the agent; it cannot be inferred from the agent's dealings with

third parties." *Id.* (citation omitted).  By contrast, apparent authority "is created as to a

third person by written or spoken words or any other conduct *of the principal* which,

reasonably interpreted, causes the third person to believe that the principal consents to

have the act done on his behalf by the person purporting to act for him."  *Pinkham v.*

*Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992) (quoting Restatement (Second) Agency

§ 27).

Here, Wanna does not seriously contend that MyLife had actual authority to act

on Lexis's behalf, and for good reason:  The 2011 data-licensing agreement between

Lexis and MyLife expressly disclaims any agency relationship.  ECF No. 28-1 § 9.1.1.

A disclaimer of an agency relationship is not necessarily dispositive, *see Bd. of Trade of*

*City of Chi. v. Hammond Elevator Co.*, 198 U.S. 424, 437–42 (1905), but Wanna's factual

allegations are patently insufficient to support a plausible inference of actual agency in

the face of the contractual disclaimer.[2]  Wanna does not allege, for example, that MyLife

---

[2]Refusing to accept the obvious, Wanna argues that the fact that she has no
evidence of an agency relationship between Lexis and MySpace just reflects how
effectively Lexis has *hidden* that agency relationship.  ECF No. 35 at 7, 13.  But Wanna's
allegation that Lexis has concealed an agency relationship is no more plausible than her
allegation that an agency relationship exists.  To survive a motion to dismiss, Wanna
must plead facts, not conspiracy theories.  *Cf. Twombly,* 550 U.S. at 556–57 (finding no
plausible claim stated by a mere "conclusory allegation of agreement at some
(continued...)

was "compensated as if" it were an agent, that the lion's share of MyLife's profits was funneled to Lexis through an elaborate scheme designed to "'artfully disguise' their real relationship," or that MyLife's customers knew that they were actually dealing with Lexis.  *See New Millenium*, 695 F.3d at 858 (quoting and distinguishing *Hammond*, 198 U.S. at 441).

The contract between Lexis and MyLife merely granted MyLife "a restricted license so as to permit [MyLife] to resell the data" that it purchased from Lexis.  ECF No. 28-1 § 1.2.  The contract left MyLife free to obtain data (whether supplemental or duplicative) from other sources and to use that data to further its own independent business goals, consistent with an arms-length business transaction.  ECF No. 28-1 §§ 5.3, App'x 1.  The complaint itself alleges that MyLife's reports, though "principally" derived from Lexis data, included "minor input from other sources."  Compl. ¶ 13. Moreover, the complaint states that the CEO of MyLife—not Lexis—"makes or authorizes all decisions—including the decision to engage in the company's efforts to extort individuals though the public posting of illegally obtained and, in many cases, false, damaging information online."  Compl. ¶ 69.  These factual allegations indicate a mutually beneficial but independent business relationship, not a principal-agent

---

[2](...continued)
unidentified point" without "enough factual matter (taken as true) to suggest that an agreement was made" in violation of antitrust law).

relationship. *See* Restatement (Second) of Agency § 14J ("One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction . . . .").

In sum, the complaint does not plausibly allege that Lexis consented to have MyLife act on its behalf, or that MyLife consented to be (or was in fact) subject to Lexis's control in the conduct of its allegedly unlawful activities. Therefore Wanna has failed to plausibly allege actual authority.

Wanna has likewise failed to plausibly allege apparent authority, as the complaint is devoid of any allegations that Lexis manifested to Wanna (or any other third party) that MyLife was authorized to act as its agent. Wanna has also failed to allege that she (or any other third party) reasonably believed, based on *Lexis's* words or deeds, that MyLife was acting as Lexis's agent.

Finally, Wanna asserts a ratification theory of agency, which is often the last refuge of a plaintiff struggling to establish an agency relationship where none exists. ECF No. 35 at 11–13. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *BE&K Const. Co. v. N.L.R.B.*, 23 F.3d 1459, 1466 (8th Cir. 1994) (quoting Restatement (Second) of Agency § 82) (cleaned up). "Ratification does not result from the affirmance of a

transaction with a third person unless the one acting purported to be acting for the ratifier."  Restatement (Second) of Agency § 85(1).  The primary rational for ratification "is to give to the other party what the other expected to get in dealing with the agent. This reason does not exist if the other party does not intend to deal with the principal." *Id.* § 85 cmt. a.

Again, Wanna does not allege that MyLife ever purported or intended to act as Lexis's agent in its dealings with Wanna (or any other third party).  On the flip side, nothing in the complaint suggests that Wanna (or any other third party) believed that she was dealing with *Lexis*, rather than MyLife, when viewing the MyLife website or its search-engine teaser pages.  That is hardly surprising, given that the 2011 agreement expressly forbids MyLife from identifying Lexis as a data provider.  ECF No. 28-1 § 9.1.10.

Thus, even if Wanna had plausibly alleged that Lexis, "having full knowledge of all the material facts, confirm[ed], approve[d], or sanction[ed], by affirmative act or acquiescence" MyLife's allegedly unlawful conduct, *Anderson v. First Nat. Bank of Pine City*, 228 N.W.2d 257, 259 (Minn. 1975), Wanna would still not have plausibly alleged ratification because she has not plausibly alleged that MyLife's unauthorized activities were professedly done on Lexis's account.  *See Mitchell v. Minn. Fire Ass'n*, 51 N.W 608, 610 (Minn. 1892) ("A ratification is only effectual when the act is done by a person

-14-

professedly acting as the agent of the party sought to be charged as principal."); *Gran v. City of St. Paul*, 143 N.W.2d 246, 249 (Minn. 1966) ("It is true that ratification cannot result unless the person acting purported to do so for the one said to be the ratifier.").

For these reasons, Wanna has failed to plausibly plead the existence of an agency relationship between Lexis and MyLife.

### 3. Federal Claims

As noted, Wanna pleads claims under FCRA, DPPA, and RICO.  Each of those claims must be dismissed, mostly because of Wanna's failure to plausibly plead that MyLife acted as Lexis's agent.

### *a. FCRA*

In Counts 1 and 2, Wanna alleges that Lexis both willfully and negligently failed to comply with the requirements of FCRA when it supplied information to MyLife. Lexis argues that Wanna has not plausibly pleaded that Lexis is a "consumer reporting agency" ("CRA") subject to FCRA.

Under FCRA, a "'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f).  To be a CRA, then, an entity must "intend[] the

-15-

information it furnishes to constitute a 'consumer report.'" *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 104–05 (2d Cir. 2019) (citation omitted).  A "consumer report," in turn, is "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" employment, personal credit, or other enumerated purposes.  15 U.S.C. § 1681a(d)(1).

*MyLife* clearly meets the statutory definition of a CRA.  The complaint alleges that MyLife assembles and evaluates consumer information for the purpose of providing its "reputation score" on MyLife profile pages—pages that are then advertised for use in making the types of eligibility determinations identified in the FCRA.  *Lexis's* role, however, is harder to discern from the complaint (at least when the agency allegations are disregarded).  The complaint alleges that Lexis assembles information about consumers to sell to third parties, but notably does not allege that Lexis does so with the intent that the information be used for any of the enumerated eligibility determinations.  Compl. ¶¶ 89–90.

Instead, Wanna alleges that "Lexis's agent for the sale of its reports, MyLife," sells *MyLife reports* explicitly for use in enumerated eligibility determinations.  Compl.

-16-

¶¶ 91–92, 97.  But *MyLife's reports* are not *Lexis's reports* (given the absence of an agency

relation), even if those reports are "principally" based on information that MyLife

purchases from Lexis.  Compl. ¶ 13.  The distinction is important, particularly because

the complaint acknowledges[3] that "MyLife . . . itself is the true publisher of most of the

negative information, having falsely (and illegally) interpreted third party records,

failed to verify records as promised, falsely attributed records to the wrong users,

added additional fabricated information, and in nearly all cases, heavily editorialized

otherwise accurate information."  Compl. ¶ 32.

     Shorn of its insufficient agency allegations, then, the complaint has not plausibly

alleged that *Lexis's data*—as opposed to *MyLife's reports*—were furnished with the intent

that the data be used for consumer-eligibility determinations.  Thus, the allegations in

the complaint do not give rise to a reasonable inference that Lexis qualifies as a CRA.

The FCRA claims are therefore dismissed.

### b. DPPA & RICO

     Wanna's DPPA and RICO claims (Counts 4 and 6) are intertwined, with both

premised on allegations that Lexis engaged in acts of extortion against Wanna and other

subjects of MyLife profiles who were offered the chance to pay to have their profiles

altered or removed.

---

[3]The complaint repeatedly contradicts itself in its allegations concerning which
entity (Lexis or MyLife) engaged in which conduct.  *See, e.g.*, Compl. ¶¶ 32, 46.

DPPA provides for a private right of action against a "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter . . . ."  18 U.S.C. § 2724(a).  The plaintiff bears the burden to plead and then prove that the defendant had an impermissible purpose for obtaining or disclosing the information.  *Potocnik v. Carlson*, 9 F. Supp. 3d 981, 988 (D. Minn. 2014) (citing *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1110–14 (11th Cir. 2008)).

Similarly, RICO provides a private right of action for persons injured in their business or property by violations of its substantive prohibitions.  18 U.S.C. § 1964(c).  Wanna alleges violations of multiple substantive prohibitions, each of which requires the plaintiff to establish a "pattern of racketeering activity."  18 U.S.C. § 1962.  To show a pattern of racketeering activity, a plaintiff must identify at least two predicate criminal acts that are related and "amount to or pose a threat of continued criminal activity."  *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 356 (8th Cir. 2011).

Wanna alleges that Lexis violated DPPA and RICO by "conspir[ing] with [its] agent MyLife" to fraudulently obtain "personal information" from "motor vehicle records" and disclose that personal information to anyone, for a price, in order to extort even more money from the subjects of the records.  Compl. ¶¶ 31, 78, 222.  The complaint is short on details, alleging only that at some times, in some places, some

Lexis defendants obtained some motor vehicle records from the DMVs of some states (including Minnesota) by fraudulently certifying that the records would only be used for permissible purposes, intending the whole time to use the personal information acquired from the DMVs for the impermissible purpose of extorting money from the subjects of the records "through their agent MyLife."  Compl. ¶¶ 145–46, 148, 222.  This scheme to extort the subjects of MyLife profiles is alleged to constitute the impermissible purpose for purposes of DPPA and to consist of predicate acts of extortion for purposes of RICO.[4]

As Wanna has not plausibly pleaded that MyLife was Lexis's agent, however, Wanna has not plausibly pleaded that Lexis—as opposed to MyLife—was engaged in any scheme to extort the subjects of MyLife's profiles.  Because neither the impermissible purpose of extortion nor the predicate acts of extortion are adequately pleaded in the absence of an agency relationship, Wanna has neither stated a claim for a DPPA violation nor stated a claim for a RICO violation.

---

[4]Wanna's conclusory claims of mail, wire, and identification fraud as predicate acts are not supported with any factual allegations, let alone pleaded with particularity. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919–20 (8th Cir. 2001) ("The particularity requirements of Rule 9(b) apply to allegations of mail fraud and wire fraud when used as predicate acts for a RICO claim." (cleaned up)).

4. Remaining Claims

Wanna's remaining claims all arise under state law.  Wanna does not allege that there is diversity jurisdiction over those claims under 28 U.S.C. § 1332(a), and the allegations in the complaint suggest that complete diversity is lacking.  Compl. ¶¶ 65, 68(d) (alleging that Wanna is a resident of Minnesota and that one of the defendant corporations is a Minnesota corporation).

Wanna alleges in a conclusory way that this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), but she has not adequately alleged the requisite amount in controversy with respect to her proposed "Defamed Class."  *See id.* § 1332(d)(2) (requiring that the amount in controversy exceed $5 million). Wanna's other two proposed subclasses are (1) an "FCRA Privacy" class, which relates only to her now-dismissed FCRA claims (and for which CAFA jurisdiction is irrelevant); and (2) a "Driver Data Privacy Class," which relates to her claims under RICO and DPPA, and for state-law civil conspiracy.  The Court has already dismissed her RICO and DPPA claims, however, and she cannot maintain a civil-conspiracy claim without an underlying tort.  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008).  And again, to the extent that Wanna may intend to rely on her defamation claim as the underlying tort for this proposed subclass, she has failed to allege the

requisite amount in controversy under CAFA. Wanna has therefore failed to meet her

burden to show that the Court has original jurisdiction over any of her state-law claims.

Because the Court has dismissed the claims over which it has original

jurisdiction, the Court declines to exercise supplemental jurisdiction over Wanna's

state-law claims. 28 U.S.C. § 1367(c)(3); *Barstad v. Murray Cty.*, 420 F.3d 880, 888 (8th

Cir. 2005) (courts should ordinarily decline supplemental jurisdiction when all original-

jurisdiction claims have been eliminated before trial). The remaining claims are

therefore dismissed without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 18] is GRANTED as to Counts 1,

2, 4, and 6 of plaintiff's complaint [ECF No. 1], and those claims are

DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise

supplemental jurisdiction over plaintiff's remaining claims, and those

claims are DISMISSED WITHOUT PREJUDICE..

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 29, 2024

 s/Patrick J. Schiltz
Patrick J. Schiltz, Chief Judge
United States District Court